May it please the Court, my name is Brooks Beard, here on behalf of Appellants Officers Couch, Jimenez, and Torres. The citizens of California have entrusted two entities with the power to run this state's prison systems and control its inmate population, the Department of Corrections and the Office of the Inspector General. This case brings to light the serious harm that occurs when the individuals who run those entities abuse that power. The question today is whether the three elite correctional officers who have blown the whistle on this abuse of power have pled sufficient facts to proceed in their efforts to eradicate this deeply rooted corruption. To resolve this appeal, it is critical to understand how peacekeepers can even exist in California's prisons.  First, it requires influential inmates, usually senior gang members, who have the ability to control other inmates. And second, it requires senior correctional staff who will provide illegal favors to those influential inmates, such as permitting drug trafficking and sanctioned assaults without the risk of prosecution, all in exchange for their agreement to control other inmates. If these illegal activities are uncovered, it could result in civil liability and criminal prosecution, not just for the inmates who were involved, but also for those CDCR and OIG employees who used, condoned, and covered up the illegal use of peacekeepers. We have a little bit more definition on the First Amendment claim from the Supreme Court in the Garcetti v. Ceballos case. I'm interested to know what allegations we look to to suggest that the statements that these officers made were made as public citizens, as opposed to simply part of their job and part of the prison employment situation. Although we didn't state in our pleadings that Officers Couch and Jimenez have no responsibility for any kind of investigating the corruption of other correctional officers, by reading through the pleadings, it becomes quite clear that Officers Couch and Jimenez were tasked with investigating the misconduct of inmates, not other correctional officers. Further in our pleadings, we allege that investigations relating to correctional employees are done by the Office of Internal Affairs within CDCR, and at times by the Office of the Inspector General. The protected speech here was their efforts to report correctional employee involvement in the illegal use of peacekeepers, and that's what distinguishes this case from Garcetti, which involved a deputy district attorney who was providing his speech in the context of official duties. Sotomayor, isn't that a general obligation they have under the oath they take anyway, as a correctional officer? As a general matter, yes, but that could hold true for other cases. We always have this problem in these cases where arguably anything that smacks of misconduct or whatever is certainly of public interest, but is it really in the context of their job that they're reporting it? And that's where I'm having some trouble understanding that. I don't see those allegations here that they're not job-related. Sure. I think there's two responses to that. The first is the allegations in the complaint are those that relate to their efforts to go to the Office of Internal Affairs to have these investigations conducted, and when they went to their supervisors, they were railroaded in those similar efforts. Can you give us paragraph numbers in your complaint? Yes, Your Honor, if you'd just give me one moment. If you look at page 16 of our opening brief, we cite to Officers Jimenez and Couch's complaints to the Internal Affairs about Defendants Wan and Bancori's suppression of the peacekeeper-related evidence, which appears in our pleadings at paragraphs 165 and 166. That's just an example. Other examples are set forth also on page 16. I would also point out that in the Garcetti decision, the Court left open the earlier decision from Gervon, which dealt with a teacher who had reported issues associated with hiring practices to that individual's principal, and query whether that individual would have a similar obligation in her role as a teacher to report. But the point being is it comes back to two things. One, that these officers, their normal responsibilities were to investigate misconduct by inmates only. They did not get involved in investigation of other correctional officers. To the extent that we're evaluating whether, you know, reporting misconduct of other correctional officers is within the scope of their official duties, that becomes a factual issue, one that needs to be resolved through discovery and through other testimony about what their roles were. Turning to the due process argument, Officers Couch and Jimenez should be permitted to proceed with their due process claims because they were deprived of their due process claims. Let me just back up for a moment. Assuming we were to conclude that it's not possible to tell from your complaint what part of their official duties, what they were reporting as part of their official  duties, do you – have you waived under the Alaska case that we cited to you a right to amend and try and do it so that we can understand the differentiation you're making? Sure. Thank you, Your Honor. The answer is no. We have not waived our leave to amend. First and foremost, we believe that Officers Couch, Jimenez, and Torres do not need the leave to amend. But if this Court concludes that they have not pled sufficient facts, they should be granted leave. The Alaska v. United States decision that was identified by this panel is not the most on-point Ninth Circuit decision. The more on-point decision is Schreiber Distributing v. Servwell, 806 Fed 2nd, 1393 at 1401. I've provided copies of that decision to the panel and to opposing counsel. There, the district court had dismissed with prejudice RICO claims. The plaintiff had not sought leave to amend, and the district court did not grant leave to amend. On appeal on that issue, this Court reversed, saying that leave to amend should have been granted and grounded its ruling in the language of Rule 15. Quoting from that decision, quote, it is of no consequence that no request to amend the pleading was made in the district court, end quote. Turning to the Alaska decision, it's distinguishable both factually and legally. There, the United States requested for the first time on appeal, after having sought reconsideration as well, leave to amend in answer, not a complaint. Also, the two cases cited by the Court in Alaska to support its ruling or conclusion that no leave to amend should be granted are also factually distinct. In the Black case, the parties had filed papers other than pleadings in response to a motion to dismiss, and in fact, the plaintiff had sought summary judgment, thereby taking it out of the realm of Rule 12b-6, motion to dismiss, and out of the realm of Rule 15. Likewise, the Jackson decision, also cited by the Alaska Court, same thing. In response to a motion to dismiss, the briefing was supported by affidavits, and thus it became a summary judgment motion. Finally, even if Schreiber were not most analogous, which we believe it is, the unique facts and circumstances here warrant granting leave to amend. Here, the officers did not seek leave to amend as part of their opposition to the motion to dismiss. And they never had a chance to seek leave because the request that was a – because the request was unilaterally preempted by the district court. Quoting from the district court's order, quote, Plaintiffs did not request an attempt to amend the First Amendment complaint and this Court will not grant an attempt to amend it. Stretching 40 pages and more than 300 numerated paragraphs, the First Amendment complaint reflects apparently all which plaintiffs could conjure up on the alleged matters. As explained above, a further tortured pleading is unnecessary and would serve no meaningful purpose given plaintiffs' opportunities to attempt to allege claims. Thus, the district court anticipated and rejected a request for leave to amend in a manner that was equivalent to the officers having sought leave in the first place. And given the strongly worded order, seeking leave at that point would have been futile. For that reason, if leave to amend is necessary here, we believe that we're on firm ground to request it. I have some questions on your RICO claim. I'm trying to understand what the damages, the RICO damages are for the claim of the alleged violation of various underlying predicate acts. And I'm having trouble linking those up because some of them seem solely personal, like emotional distress of, I believe, Officer Torres, for example. So would you, on the RICO claim, explain what you think the RICO damages are and what they spring from? What are the claims they spring from, individuals to the officers? Because there's a lot of officers general in this case and you have to go I understand, Your Honor. And I would like to reserve three minutes for rebuttal, so I'll respond to your question briefly. Regarding the injury to business and property, we have to keep in mind that the denial of employment benefits, losing business opportunities, and losing wages are all cognizable business and property injuries. Here, we allege as to Officers Couch. Potentially, Your Honor, yes. That will be the subject of expert testimony. The fact that they were kicked out of ISU for pretextual reasons decreased their chance to have overtime and to have other opportunities for advancement within the organization. So that will be the subject of expert testimony as to whether the effect of being kicked out, the effect of that ultimately resulted in the loss of wages or other opportunities within departments. As to Officer Torres, the focus is on the fact that he was harassed and attempted to the effect that it caused a failure to protect him from threats. Threats that were made by inmates to his life. This is Officer Torres, the third of the officers. There were threats to his life which... After he had shot an inmate due to a peacekeeper-ordered hit on another inmate, a threat against his life was put out by that peacekeeper and the defendants did nothing, although they were aware of that threat, did nothing to protect him. It's not in the middle in any way of the claim, but it's a RICO claim. It's not a personal injury claim. That's correct, Your Honor. The business or property for that individual. And how does it link? Again, citing to the, from our papers, we cite the Garacci v. Women Alliance decision, which says that out-of-pocket costs such as travel, lodging, telephone calls, and food sufficient for a showing of damages to business or property under RICO. Likewise, the out-of-pocket expenses that Officer Torres incurred for psychological counseling as a... You know, you can't just, that's like saying you can get costs and fees in a lawsuit. I mean, they've got to be tied to something. It's tied to personal injury. So go on to the other officers as to what the claims are. As to the other officers, again, it was the fact that they were removed from the ISU to investigate the big crimes that would allow them to move up through the ranks at CDCR. And ultimately, it was that they were kicked out of ISU altogether for pretextual reasons. As a result, they lost opportunities for overtime and advancement, all due to safety concerns and due to the reputation that will follow them as a result. With that, I'd like to reserve the last two minutes for rebuttal. All right. Thank you. Good morning, Your Honors. May it please the Court. Mary Horst on behalf of the CDCR defendants. I would like to advise the Court that I wanted to give Mr. Beard at least four minutes for him to speak to you about his clients. Very simply, six words. The district court got it right. And I think that this Court needs to affirm the district court's ruling. It was a very well-reasoned, articulate decision that went through all of counsel's arguments and found that he had failed to state a claim. Now, this Court has requested that we discuss the First Amendment issue as well as the Leave to Amend and one of the RICO cases. So I'm going to focus on that. Garcetti makes clear that the speech must be in the capacity of a private person. Everything in Plaintiff's complaint, which is over 300 paragraphs long, which spans 40 pages, makes very, very clear in specific factual detail that this was related to Plaintiff's job. The complaints that were made had to do with their work as correctional officers in the investigative services unit at the prison. And you just address his claim that he says, well, that would be true if they were complaining about inmates but not officers. And I will, Your Honor, because there's actually two cases that are post-Garcetti out of the Ninth Circuit, which I think, as a matter of law, this Court can find that their conduct was not protected. And the first is Freitag or Freitag v. Ayers, where there was a complaint this Court held that correctional officer complaints to supervisors or the administration within the prison, i.e., up the chain of command, are not protected. That's what's going on here. And Huppert v. City of Pittsburgh. And Huppert is perhaps the stronger case to show that it is, as a matter of law, investigations conducted at the request of supervisors are not protected under Huppert. Reporting of illegal activities by a peace officer, which is what the plaintiffs are under Penal Code Section 830.5, is in furtherance of their job duties and is not protected speech. You're citing the City of Pittsburgh case and other cases. Isn't it fact-specific here as to what the responsibilities of these people are and whether their speech is protected or not protected?  Or is it a case where people might have other responsibilities to the facts here? Well, the reason you can apply the case here, and one of the reasons why we didn't make this argument in the initial motion is we didn't have the benefit of the Huppert case. And I agree that it's generally something that gets decided in the context of a summary judgment motion because it is fact-driven. You have a 300-plus paragraph complaint that lays out in very long detail what it was, the supposed complaints that were made, who they were made to, what supposedly flowed from that. I think that you can, in fact, look at that complaint and, given the holding in Huppert, conclude as a matter of law. Even if we conclude it as a matter of law, then they come to the question of did they get to amend because we don't know all the facts, of course, sitting here looking at the complaint. And I wanted to go on to that. I want to address counsel's citation to the case that he gave us. I first note that that case is 15 years prior to the Alaska case. And the other determining factor in that discussion said the reason they granted leave to amend was because the district court did not determine, nor can we conclude they were saying there was an insufficient factual basis on appeal, that the allegation of other facts could cure the deficiencies. We have a finding by the district court that, given the extensive nature of the facts that were alleged in this complaint, that that court felt that there was nothing else that could be alleged, and I'm going to get to that in a minute because I do not think that plaintiffs or appellants in good faith can allege additional facts, but there was a finding by the district court. And unless that was an abuse of discretion, then this court should not remand it for plaintiffs to be given leave to file. And then we are because procedurally it says if you don't bring it, it ends at no point have plaintiffs did they request reconsideration in the district court. I understand that the district court said I'm not going to grant leave to amend, but I think that they had the opportunity to request reconsideration and or put forth another complaint. Exactly. And they have never filed a proposed amended complaint. In fact, and this goes to why they cannot in good faith allege additional facts. In their briefing, I need to point out to the court that they say in the best litigation we've discovered evidence that we may be able to allege additional facts. That case is subject to a very tight protective order. I have a copy of the protective order. It is with the same law firm representing the plaintiffs in the best litigation as is representing the appellants here. And it, that protective order says no information in this case shall be used for any purpose basically outside of the litigation. And it's one of the reasons why I don't, plaintiffs can't look to that. And they made the representation in their brief, and I just wanted to bring it to your attention. And now we're into a whole extra record. Well, no, and I understand, but again, I don't, our position is that they cannot in good faith allege additional facts. Well, we don't know that. The question is whether they've waived their right to try if we conclude. And is there a difference? The last case dealt with a rule, I think, 12C dismissal, and it cites two cases that dealt with summary judgments. Isn't there a difference between those kind of merits decisions and a decision under 12B6, you didn't plead enough. So can we apply the Alaska reasoning in this kind of a case? Absolutely. And in Alaska, it is in 12B. Isn't there a difference? It's in a 12B context. I apologize. Go ahead. I'm sorry. It is decided in a 12B6 context, and the Court nevertheless said that if you did not raise it on appeal, at the district level, you cannot bring it up on appeal. And, again, I go back to the fact that the complaint here is not a three- or four-page complaint basically laying out the elements, you know. There's a lot of facts contained in this. Well, there are, but is that a rule we should adopt? If it's a long complaint, then you don't get a chance to try it again if you're dismissed on 12B6? I mean, that doesn't make sense. I would not state that, Your Honor. But I do think that it would be, if nothing else, it would be futile, because there is nothing in good faith that plaintiffs can allege that's going to take them outside the realm of unprotected speech. How do we know that? Because they've had the opportunity to put forth all of these facts. That's true. You know, when people file their first complaint, you know, they miss things. That's why we have free amendments, so to speak. In a way, I am sympathetic to your argument. I'm just wondering whether we're kind of going over to summary judgment, because we have these statutes that relate to their duties and that sort of thing. Or whether we're looking at a motion to dismiss supplemented by, in which case it's not to say you couldn't bring it again, but I'm just wondering if that's where we would be. Well, our position is that they did, in fact, waive it. I have a couple more minutes. I'd like to briefly just touch on the RICO. I'd like to talk about the RICO, because that's the most element-intensive, let's say. Yes. And under the Hemi group case, which the Court asked us to look at, what I found interesting, let me back up. Hemi says that it not only has to be a but-for, but the proximate cause as well. There's a whole causation issue. And one of the things you can look at in determining causation is whether better-situated plaintiffs would have an incentive to sue. Here, if you're saying that inmates are putting out, are making hits on other inmates, it seems to me that the people best-situated to sue would be the other inmates. Going to the Court's questions about compensable damages, they are personal in nature. They are not recognized under RICO. As far as predicate acts... Well, what about the wages? And then I guess they have to be tied back to the predicate acts. But they're saying that, based on Guerrero, which of course is a district court, not a circuit case, but they're saying that loss of wages, which could mean, let's see, how did they put it? A decrease of a chance of overtime and advancement. They are talking about lost opportunity. They are not talking lost wages, because there is no allegation, nor can there be, that they did actually, in fact, lose any wages. Guerrero is distinguishable, I believe. That involved an inmate who was improperly incarcerated.  And that inmate is not subject to that particular situation and is not, should not be used as a way to get around the very specific statutory requirements that, about compensable injuries under RICO. That's a very narrow exception. Counsel, I think, would want to use it to try to open up RICO to any type of personal injury. And I don't think that they should be able to do that. In the Ninth Circuit, in the Diaz case, that was the case involving the suit against the Los Angeles PD, where they fabricated or allegedly fabricated evidence. And the district court threw it out on a RICO claim because they were alleging loss of employment, loss of employment opportunities and wages and compensation associated with unable to get the kind of work. And the Ninth Circuit said, no, that's enough for standing, a RICO standing. Did they not? I believe they said for RICO standing. Again, I believe it was in the context of an inmate bringing the lawsuit. And that is a different issue than whether the injury is compensable. And I apologize because I'm at my four minutes. That's what we're going to give you. Okay. Thank you. Going on to the causation issue, which is what HEMI really deals with, I think here, even if you assume, for purposes of argument, that there is a predicate act that falls under RICO, which we don't concede in any way, but let's assume that there is, it did not directly harm plaintiff because it's contingent on any number of  In the case of the plaintiff's theory, and I'm still not quite sure I do, plaintiffs complained, would have complained to some agency. That agency may have then conducted an investigation. That investigation may or may not have then resulted in the filing of some type of charges against someone, and perhaps if that case was then prosecuted, that case would then be prosecuted by some other agency, whether it be, I don't know, the U.S. attorney, I'm not sure, some other agency against perhaps other correctional officers, perhaps against other inmates. It's just, it's even more attenuated than HEMI. I think what they're saying, I don't know if they can say it themselves, but it is very hard to unscramble from the briefs and the complaint what really is the RICO violation. But I think they're saying, well, one of the things is there's these ongoing federal investigations and we're not permitted, well, we're kind of waived off of those, of even being able to provide information for those, and so we're kind of, that's like an obstruction of justice type charge, as I read it, as a predicate act, one of the predicate acts. And, Your Honor, I do think that you could read it that way. Again, it is very vague. In looking at the complaint, to understand the RICO claim, again, I don't understand it, I don't think that they've established the elements. The closest that they get to obstruction of justice is, as you say, but again, we run into the whole causation issue. Okay, so if they did, in fact, talk with these federal people, you sort of have to presume that then the federal, they would have taken the federal information, and then what would they have done with the federal information, and would they have filed suit against, charges against someone else? I just, I don't see the causation at all. Is that an issue that you deal with at summary judgment, as opposed to whether you've alleged enough to state a claim? Not on a RICO. I don't believe so on a RICO. I mean, the plaintiff has that burden of establishing and showing all of the elements, including the causation, and I think that's what HEMI stands for. All right. Thank you, Your Honor. Good morning, Your Honors. Good morning. May it please the Court? Why don't we reset the clock to three and a half minutes? My name is Jeffrey Beatty. I represent Matthew Cate and David Shaw. We've called them in this litigation the OIG defendants. The case against the OIG defendants set forth in the First Amendment complaint is incredibly sparse. There is only one act alleged by either of my clients. That act is David Shaw is alleged to have gone to the facility, the SATF, people call it SATF, and spoken with Defendant Juan about his potential or CDCR potential liability because of the use of peacekeepers and suggesting Mr. Juan retire. That's it. That's the only act alleged in the entire complaint against David Shaw. There is no act alleged against Matthew Cate. The references throughout the complaint as to their involvement are conclusory supposition based upon a claim of conspiracy, influence, and they're high up and they have this influence, so they must have known. Those are the allegations against Cate and Shaw. I'd like to turn to... Okay. You said that Mr. Shaw talked to whom? Associate Warden Juan. Oh, okay. Thank you. I thought the Hemi case that the Court asked us to look at was interesting and I have a couple of points to make about it. As I read Hemi, the Supreme Court has said very clearly that a predicate offense, a RICO predicate offense must be not only a but-for cause, but also proximate cause. You need a direct relationship between the injury asserted and the injurious conduct. In other words, the predicate act. So in Hemi v. City of New York, the facts were that the City claimed they were harmed because of Hemi's predicate act. That predicate act was not reporting to the State of New York their cigarette sales. That was the act. And Hemi was required to under, I think it was the Jenkins Act, but they didn't do it. So they were clearly doing something wrong. The proximate cause, strike that, the City was frustrated in its ability to collect taxes from the people in New York who bought them because it didn't know who bought them. And they posited that the way we're going to find out is we'll look at the reports from the State that Hemi is obligated to provide. Then we'll know who bought the cigarettes and we can go chase them for the tax dollars. The Supreme Court pointed out that the proximate cause of this alleged harm, inability to collect the taxes, was that the buyers didn't pay tax to the City. It wasn't Hemi's failure to report. It was something one or two steps further down. And that in proximate cause analysis in the RICO predicate act context, that the courts should not go beyond that first step. Now, what is the lesson here in this case? The plaintiffs claim that they were harmed by the support, condoning, and use of peacekeepers by all of the defendants, the CDCR defendants and the prison management, as well as the inspector general defendants, my clients Matthew Cate and Dave Shaw. What is the cause of the harm? Their harm is that they were demoted. They weren't harmed by the predicate acts, if you can construe a predicate act out of this complaint as against my clients. Whatever this predicate act was, this conspiracy must have known, must have supported, that didn't cause this harm. The harm was that they were demoted or moved out of ISU into a regular correctional officer job working among inmates in the housing units. Okay. You have exceeded your time now, if you want to just wrap it up. I will wrap it up right there. All right. Thank you. Thank you, Your Honor. Your Honor, I would like to address three points. On the First Amendment issue, I would like to point out important language from Garcetti. First, quote, that Sobolos expressed his views inside his office rather than publicly is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work, end quote. The second important limitation, quote, the memo concerned the subject matter of Sobolos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job. The controlling factor in Sobolos' case is that his expressions were made pursuant to his duties as a calendar deputy. That distinguishes what's happening here. Our officers are tasked with investigating inmate misconduct. Just because they might have an obligation in the ordinary course as correctional officers to report misdoings, that does not mean that it's within the scope of their official duties. The second point I'd like to make relates to the RICO issue. First of all, the Hemigroup case has little to no impact on the analysis here based upon what constitutes the majority opinion. What's the predicate act? Your Honor, the predicate act here is the harassment and retaliation that kept our clients, the officers, from reporting the peacekeeper issue, in particular, the CDCR employee and OIG employee side of the peacekeeper issue to the Federal investigators who are investigating peacekeepers. I also want to quote from the statute, defendants would like you to read this language out. It says, for the purpose of this section, an official proceeding need not be pending or about to be instituted at the time of the offense. That's critical. Even though there is an investigation ongoing, that wasn't even necessary. The final point I'd like to make is that OIG's, regarding the OIG allegations, I would like to note here that the Office of Inspector General and CDCR are the ones who are supposed to eradicate these wrongdoings. They are not doing so. And who better, who's going to be in a better position than these correctional officers to see that wrongdoing from the perspective of internal management, the structure? This is a paramilitary organization. They understand what the pecking order is and how decisions are made. We're talking about inmate deaths. Thank you, Governor. Thank you. Thank all counsel for your argument this morning. The case of Couch v. Cate is submitted.
judges: Zilly, Hall, McKeown